J-S60024-19

2020 PA Super 94

J.S.                                   :    IN THE SUPERIOR COURT
                                       :      OF PENNSYLVANIA
                  Appellant            :
                                       :
                                       :
                                       :
           v.                          :
                                       :
                                       :
                                       :
R.S.S.                                 :    No. 1069 MDA 2019

Appeal from the Order Entered June 4, 2019
In the Court of Common Pleas of Dauphin County
Civil Division at No:  2015-CV-046911-CU

BEFORE:   SHOGAN, J., STABILE, J., and PELLEGRINI, J.*

OPINION BY STABILE, J.:              **FILED: APRIL 14, 2020**

J.S. ("Father") appeals from the order entered June 4, 2019, awarding

sole legal and primary physical custody of the parties' daughter, A.S. ("Child"),

to R.S.S. ("Mother").  Father argues that the trial court lacked subject matter

jurisdiction to enter the order and erred by denying his motion to continue the

custody hearing.  After careful review, we affirm.

The trial court summarized the tortuous facts and procedural history of

this matter as follows:

> Mother and Father were married in Pennsylvania in 2008.
> Their only child was born in April 2012.  During their marriage the
> family lived in Dauphin County, Pennsylvania.  Following their
> 2014 separation, Father moved out of the marital home.  Although
> they divorced in October 2015, they continued to act as a couple
> in many respects including maintaining an intimate relationship
> through the end of October 2017, well after Father's remarriage
> and after he moved with the [c]hild to Hungary with his new wife
> unbeknownst to Mother.

---

* Retired Senior Judge assigned to the Superior Court.

Father initially filed a complaint in Dauphin County seeking custody and notice of intent to relocate to Hungary in June 2015. He stated it was his intent to relocate in November 2015. Mother filed a counter-affidavit stating she did not oppose relocation. As noted in detail below, Mother later pled and testified that she did not oppose relocation at the time because Father had falsely told her he was going to be entering a witness protection program. On August 13, 2015, following a conference with a custody conciliation officer, the parties reached an agreed custody order granting Father sole legal and physical custody of the [c]hild and permitting him to relocate. The order contained no specific provision concerning Mother's physical custody but only a statement that the parties understood and stipulated that "an expanded or altered schedule may be agreed upon" at a later date and that both retained the right to seek modification.

There was no activity in this custody action until November 30, 2017, when Mother filed petitions for custody modification and special relief. In her petitions, she asserted that despite the entry of the 2015 custody order, the parties immediately disregarded its terms. Father did not exercise sole legal and physical custody, nor did he move with the [c]hild to Hungary. Instead, Mother exercised extensive physical custody including times when she had primary physical custody of the [c]hild, who resided with her in the former marital home in Hummelstown (the "farmhouse"). As alleged, Mother claimed that over time, the [c]hild began to spend less time with her and more with Father as Father convinced Mother to work more hours at her nursing job. During this time, Mother repeatedly asked Father to return the [c]hild but he failed to do so despite many promises to the contrary. . . . Father eventually cut off Mother from any contact with the [c]hild, around July 2016. Father did not inform Mother he had moved to Hungary with the [c]hild in July 2016 and Mother continued to believe the [c]hild was with Father at undisclosed locations in the Pennsylvania area.

Mother additionally alleged that between July 2016 and May 2017, Father continued to visit her at the farmhouse and they remained sexually intimate, even after Father married his current Hungarian wife E.S. in December 2015. E.S. had previously been a nanny to the [c]hild prior to the parties' separation. In late October 2017, Mother was told by a friend that she observed Father and the [c]hild in the Central Pennsylvania area, along with E.S. and their newborn, prompting Mother to file her current petitions. . . .

\*\*\*

Following a custody conciliation conference [on] January 17, 2018, addressing Mother's petition to modify custody, the matter was assigned to [the trial court] for a custody trial. Father retained an attorney who filed preliminary objections. Father argued that Pennsylvania no longer maintained subject matter jurisdiction over Mother's custody modification request under the Uniform Child Custody Jurisdiction and Enforcement Act (["]UCCJEA["]), primarily because the [c]hild no longer lived in Pennsylvania but had been living in Hungary since July 2016. He alternatively argued that, assuming Pennsylvania retained jurisdiction, [the court] should nevertheless transfer the custody action to Hungary under the UCCJEA on inconvenient forum grounds.

In her response opposing the preliminary objections, Mother explained that at the time she agreed to grant Father sole legal and physical custody in August 2015, she did so because Father manipulated her into believing he was in danger and might be entering a witness protection program. Mother believed Father's lies that the [c]hild's safety was also imperiled. Father also led her to believe, until late October 2017, they were going to be "a family" again as soon as his situation was safe enough for him to return to her with the [c]hild from whatever undisclosed location he was living [in]. She asserted she therefore refrained from formally seeking custody as a result of Father's misrepresentations to her.

[The trial court] held a hearing [on] February 27, 2018 on the preliminary objections at which Mother testified in person and Father testified via videoconferencing . . . allegedly from Hungary. . . . [The court] held a second hearing [on] March 29, 2018 at which Father also appeared and testified by videoconferencing. Following production of the transcripts and briefs, [the court] issued an order [on] August 17, 2018 overruling Father's objection contesting Pennsylvania jurisdiction and denying his motion to transfer this action to Hungary.

Trial Court Opinion, 7/16/19, at 1-4 (footnote omitted) (citations omitted).

On September 18, 2018, Father filed a notice of appeal from the August 17, 2018 order, at Superior Court docket number 1546 MDA 2018. Because his appeal was untimely on its face, Father filed a petition for leave to appeal *nunc pro tunc* in this Court. This Court denied Father's petition on October 2, 2018, without prejudice to seek the same relief in the trial court.[1] Father filed a petition requesting leave to appeal *nunc pro tunc* in the trial court on October 19, 2018. The court denied Father's petition on October 29, 2018, and Father appealed at Superior Court docket number 1907 MDA 2018.

On October 25, 2018, Mother filed a motion to quash Father's appeal at 1546 MDA 2018, arguing that the August 17, 2018 order was interlocutory, and that Father's notice of appeal was untimely even assuming that the order was final. This Court granted Mother's motion and quashed Father's appeal on November 29, 2018. Father later discontinued his appeal from the order denying *nunc pro tunc* relief at 1907 MDA 2018 on February 8, 2019.

Following Father's failed attempts to appeal, the trial court scheduled a hearing on the merits of Mother's custody petition for March 27, 2019. The day prior to the hearing, however, Father filed a motion for a continuance. He

_____

[1] On the same day Father filed his notice of appeal, he also filed a motion in the trial court requesting that it either grant reconsideration and reenter the August 17, 2018 order as a final order, or that it enter a finding that the order presented a substantial issue of venue and jurisdiction pursuant to Pa.R.A.P. 311(b). **See Ratz v. Ratz**, 518 A.2d 317, 318 (Pa. Super. 1986) (quashing an appeal from an order that sustained jurisdiction under the UCCJEA's predecessor statute, explaining that the order was not final). The court denied Father's motion on September 26, 2018.

averred that he had suffered an injury while in Hungary, which rendered him unable to travel to Pennsylvania or participate in the hearing. Father attached a copy of a "medical certificate" written in Hungarian, along with a certified English translation. According to the translation, he "suffered s [*sic*] multiple fracture [*sic*] of his right lower leg. After-treatment of the injury is in progress, he is getting physiotherapy treatments. He is on strong analgesic drugs, so driving and operating machinery is contraindicated at present. His working capacity is currently limited." Motion to Continue Custody Trial, 3/26/19, at 5 (unnumbered pages). The court granted Father's motion, later rescheduling the hearing for June 3, 2019.

On May 23, 2019, Father filed another motion for a continuance. Father averred that he remained unable to travel to Pennsylvania or participate in the hearing because of his previous injury. He attached new documentation, also written in Hungarian, but did not include a certified translation. Instead, Father included what appeared to be an incomplete translation obtained using a computer program or a smartphone. The translation stated, verbatim, "Fentnevezett jobb subheading multiple breakage suffered el injury aftercare is in progress. Állapota due to increased the thrombosis formation of possibility so long-term travel, flight is not proposed. Pharmacological treatment of, physiotherapy management expected to have one year lasts." Motion to Continue Custody Trial, 5/23/19, at 10 (unnumbered pages). On May 29, 2019, the trial court entered an order denying the motion, "unless a PA. reputable orthopedic surgeon, reviewing all medical records from [the]

past [sixty] days, . . . opines [Father] cannot travel on commercial airlines[.]" Order, 5/29/19.

The custody hearing took place as scheduled on June 3, 2019. Father's counsel appeared at the hearing, although Father himself was absent and did not participate via telephone or videoconferencing software. Father's counsel explained at the start of the hearing that he had been unable to prepare and had no evidence to present, as he had been unable to contact Father and had been interacting solely with Father's wife, E.S. N.T., 6/3/19, at 5-13. As such, Father's counsel renewed his motion for a continuance. *Id.* at 9. Mother's counsel opposed Father's motion. *Id.* at 11. She also requested that the trial court prohibit Father's counsel from cross-examining her witnesses, based on his failure to file a pre-trial statement.[2] *Id.* at 12. The court denied Father's motion for a second continuance and prohibited his counsel from participating in cross-examination. *Id.* at 14, 35.

Following the hearing, on June 4, 2019, the trial court entered the order on appeal, which awarded sole legal and primary physical custody of Child to Mother. The order awarded supervised partial physical custody to Father "at mutually convenient times which the parties are able to coordinate."[3] Order,

---

[2] The trial court's scheduling order included a provision directing the parties to submit an updated pre-trial statement no later than five days prior to the hearing.

[3] We note that Mother also filed a petition for contempt on March 22, 2019, averring that Father violated a 2017 order forbidding him from removing Child

6/4/19, at 3. Father timely filed a notice of appeal on July 2, 2019, along with a concise statement of errors complained of on appeal.

Father now raises the following claims for our review:

I. Did the trial court err in denying [Father's] preliminary objections to [Mother's] modification petition arguing that Pennsylvania no longer had subject matter jurisdiction under the [UCCJEA]?

II. Did the trial court err in denying [Father's] motion to transfer jurisdiction arguing to the extent that if Pennsylvania still maintained jurisdiction Hungary was the more convenient forum?

III. Did the trial court err in denying [Father's] motion to continue the custody trial and then proceeding with the custody trial in [Father's] absence resulting in a final order of custody?

Father's Brief at 4 (suggested answers omitted) (unnecessary capitalization omitted).

In Father's first claim, he challenges the trial court's conclusion that it possesses subject matter jurisdiction over this matter pursuant to the UCCJEA. This Court has held that Father's claim presents a pure question of law, for which our standard of review is *de novo* and our scope of review is plenary. *S.K.C. v. J.L.C.*, 94 A.3d 402, 408 (Pa. Super. 2014).

---

from central Pennsylvania and directing that he surrender Child's passport. The trial court denied Mother's petition in a separate order entered June 4, 2019. That same day, the court entered an order, apparently *sua sponte*, scheduling a contempt hearing based on Father's failure to bring Child to Pennsylvania for the custody hearing in accordance with its scheduling order. The court later continued the contempt proceeding pending the outcome of Father's appeal. Mother filed a second petition for contempt on July 11, 2019, which the court also continued pending the outcome of Father's appeal.

Father maintains that the trial court lacked subject matter jurisdiction because Child now resides in Hungary and has no significant connection with Pennsylvania. Father's Brief at 17-21. Further, he maintains that substantial evidence no longer exists in Pennsylvania regarding Child's care, protection, training, and personal relationships. *Id.* Father blames Mother for her lack of contact with Child, insisting that she "permitted [sixteen] months to lapse before raising any objections or taking any action to modify" the parties' 2015 custody order. *Id.* at 24.

Generally, the UCCJEA governs questions of child custody jurisdiction arising between Pennsylvania and the other states of the United States. The UCCJEA also governs questions of child custody venue arising between the counties of Pennsylvania, as well as questions of child custody jurisdiction arising between Pennsylvania and foreign nations. *See* 23 Pa.C.S.A. § 5471; 23 Pa.C.S.A. § 5405(a) ("A court of this Commonwealth shall treat a foreign country as if it were a state of the United States for the purpose of applying Subchapter B (relating to jurisdiction) and this subchapter.").

At the start of a child custody case, a Pennsylvania trial court may enter an order awarding custody if it possesses jurisdiction to make an "initial child custody determination" pursuant to 23 Pa.C.S.A. § 5421. Most often, a court will possess jurisdiction if Pennsylvania is the child's "home state," meaning that the child has lived here with a parent for six consecutive months. *See* 23 Pa.C.S.A. § 5421(a)(1); 23 Pa.C.S.A. § 5402 (defining "home state," in

relevant part, as "[t]he state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding."). If a Pennsylvania trial court with jurisdiction enters an order awarding custody, this state will retain "exclusive, continuing jurisdiction" unless or until certain conditions occur.

In the case at bar, it is clear that Pennsylvania had jurisdiction to make an "initial child custody determination" at the time the trial court entered the 2015 order awarding sole legal and physical custody of Child to Father. It is undisputed that Pennsylvania was Child's home state in 2015, as Child and both parties lived here. Therefore, the only question is whether Pennsylvania retained "exclusive, continuing jurisdiction" after Father and Child relocated to Hungary in 2016. The relevant provision of the UCCJEA provides as follows:

> **(a) General rule.--**Except as otherwise provided in section 5424 (relating to temporary emergency jurisdiction), a court of this Commonwealth which has made a child custody determination consistent with section 5421 (relating to initial child custody jurisdiction) or 5423 (relating to jurisdiction to modify determination) has exclusive, continuing jurisdiction over the determination until:
>
> > (1) a court of this Commonwealth determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with this Commonwealth and that substantial evidence is no longer available in this Commonwealth concerning the child's care, protection, training and personal relationships[.]
>
> ***

**(b) Modification where court does not have exclusive, continuing jurisdiction.--**A court of this Commonwealth which has made a child custody determination and does not have exclusive, continuing jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under section 5421.

23 Pa.C.S.A. § 5422.

This Court clarified the requirements of Section 5422(a)(1) in ***Rennie v. Rosenthol***, 995 A.2d 1217, 1220 (Pa. Super. 2010), *reargument denied* (July 8, 2010).  In ***Rennie***, we observed that 5422(a)(1) contains two prongs, a "significant connection" prong and a "substantial evidence" prong, both of which must be satisfied in order for Pennsylvania to lose exclusive, continuing jurisdiction.  ***Id.*** at 1221.  Regarding the "significant connection" prong, this Court explained that Pennsylvania will retain exclusive, continuing jurisdiction "as long as the child and at least one parent have an important or meaningful relationship to the Commonwealth."  ***Id.*** (footnote omitted).  We went on to reject the appellant's contention in that case that Pennsylvania lost jurisdiction because she had relocated with the parties' child to Minnesota.  ***Id.*** at 1222.  Observing that the appellee continued to reside in Pennsylvania and exercised custody of the child here, we reasoned that a significant connection "will be found where one parent resides and exercises parenting time in the state and maintains a meaningful relationship with the child."  ***Id.***

We reasoned, "[a]s indicated in clear language in the statute, a 'significant connection' will be found where one parent resides and exercises parenting time in the state and maintains a meaningful relationship with the child." *Id.*

Critically, this Court has held that a "significant connection" will still exist for the purposes of Section 5422(a)(1) if the party living in Pennsylvania has been unable to exercise parenting time in the state due to the contemptuous behavior of the other party. *See S.K.C.*, *supra*. In *S.K.C.*, the parties' child began living with the appellant in Canada while the appellee remained in Pennsylvania. 94 A.3d at 404-05. The parties' custody consent order awarded appellee custody of the child during the first week of every month. *Id.* at 405. However, the appellant failed to comply with the order and did not bring the child to the designated exchange location. *Id.* at 412. This Court concluded that the appellee exercised parenting time in Pennsylvania and maintained a meaningful relationship with the child, even though she had not actually had custody of the child in the state for several months. *Id.* We explained,

> . . . . We refuse to incentivize contemptuous behavior on the part of a litigant. Contemptuous behavior should be punished, not rewarded. To reward contempt would undermine the very nature of the judicial process. We therefore conclude that Mother was exercising parenting time within this Commonwealth and maintained a meaningful relationship with Child notwithstanding the actual lack of parental custody time . . . . As such, Child had a significant connection with this Commonwealth.

*Id.* at 413 (citation omitted).

Applying *S.K.C.* to the facts of this case, the trial court concluded that Father's deceptive behavior prevented Mother from exercising custody of Child

in Pennsylvania, which warranted a finding that the state retained exclusive, continuing jurisdiction. The court reasoned as follows:

> . . . [T]he record fully supports a finding that Father's fraud and misrepresentations actively thwarted and deterred Mother from maintaining and exercising custodial rights in Pennsylvania and/or otherwise manipulated her in a manner that caused her to not pursue custody, which custodial contacts would have been otherwise sufficient to establish exclusive and continuing jurisdiction here. A finding that Mother lacked actual custodial time with the [c]hild in Pennsylvania (between July 2016 through November 2017), would reward Father's extraordinarily deceitful behavior and . . . it would be unjust and improper to find Pennsylvania no longer has jurisdiction.

Trial Court Opinion, 9/26/18, at 23 (citation omitted).

After a careful review of the record, we discern no abuse of discretion or error of law in the trial court's analysis.[4] The record supports the court's finding that Mother exercised parenting time in Pennsylvania and maintained a meaningful relationship with Child until the summer of 2016, when Father moved with Child to Hungary. Mother testified that Child continued to reside primarily with her following the 2015 custody proceedings. N.T., 2/27/18, at 14. Over time, Child began to reside primarily with Father, who insisted that Mother work additional hours at her job. *Id.* By July or August 2016, Father had stopped bringing Child to see Mother entirely. *Id.* at 15. Father admitted during his testimony that he did not take Child to Hungary for the first time

---

[4] The certified record before this Court does not contain any of the exhibits admitted during the hearings. Nonetheless, even without the exhibits, the record is sufficient to affirm the trial court's order.

until June 2016 and that Child did not move there permanently until July 2016. *Id.* at 92-97.

Moreover, our review of the record supports the trial court's finding that Father deceived Mother into believing that Child's absence from her life would be temporary and that it was necessary for Child's safety. Mother testified that Father told her he was in a witness protection program and that "he was in trouble and this is what had to happen in order for the child to be safe." *Id.* at 15. Despite Father's claim that he was in a witness protection program and that Mother could not see Child, Father continued to visit Mother without Child to engage in sexual relations. *Id.* Mother testified that Father engaged in a pattern of manipulation during this time, by sending her pictures of Child and then demanding that she provide him with sexual favors or pornographic videos of herself. *Id.* at 15-16. During a visit in September 2017, Father claimed "that they were all going to be coming back soon, that this witness protection program is now going to allow him to bring the child home[.]" *Id.* at 16-17. He informed Mother that he and Child would return in October 2017; however, they did not return. *Id.* at 17.

Father largely admitted to Mother's version of events during his own testimony. However, he insisted that his actions were justified due to Mother's alleged mental health problems. *Id.* at 109-110. Father claimed that Mother abused prescription drugs, that she tried to kill herself, and that she had even attempted to hire a hit man to kill him. *Id.* at 106-12. He insisted that he

"did tell her I was coming back numerous times to protect myself, protect my daughter, to protect my family and also to protect her[.]" *Id.* at 110. When Mother's counsel pressed Father on the question of why he would continue to engage in sexual relations with Mother and demand pornographic videos from her if he believed she was dangerous, he suggested that his actions were necessary to prevent Mother from harming herself. *See*, *e.g.*, N.T., 3/29/18, at 81-83 ("Because when I did it, she claimed she wanted to take pills and kill herself and end her life. She sent me numerous text messages saying, are they good or not?"). It was well within the trial court's discretion to reject this explanation as incredible and to conclude that Father prevented Mother from spending time with Child without justification. Because it would be unjust to reward Father's nefarious behavior, we conclude that Pennsylvania retains exclusive, continuing jurisdiction over this case pursuant to *S.K.C.*[5]

In reaching this conclusion, we would be remiss to suggest that a child may only retain a "significant connection" to Pennsylvania if the party residing here exercises parenting time and maintains a meaningful relationship with the child, or if they are unable to do so due to the misdeeds of another party. We did not state in *Rennie* that we intended parenting time and a meaningful

---

[5] Because we conclude that Child maintains a significant connection to this state, we need not consider the second prong of Section 5422(a)(1), regarding whether substantial evidence is available here concerning her care, protection, training and personal relationships. *Rennie*, 995 A.2d at 1223.

- 14 -

relationship to be the only way of establishing a significant connection, nor would such a reading be consistent with the plain language of the UCCJEA. Importantly, Section 5422(a)(1) requires that the child maintain a significant connection "with this Commonwealth," not that the child maintain a significant connection with the parent. 23 Pa.C.S.A. § 5422(a)(1). In this case, although Child did not spend time in Pennsylvania with Mother after July 2016, Child did spend time in Pennsylvania with Father. Child returned to this state with Father at least once after her relocation to Hungary and apparently spent over a month here, from October 25, 2017, until December 2, 2017. N.T. 2/27/18, at 25, 77, 97. During this trip, Child visited her paternal grandmother and stayed at the paternal grandmother's home in Pennsylvania "[f]or a couple of days" to celebrate the Thanksgiving holiday. *Id.* at 42-43. Child's connections to Pennsylvania extend beyond Mother, which strengthens our conclusion that the state retains exclusive, continuing jurisdiction. Accordingly, we conclude that Father's first claim is meritless.

Father's second claim is that the trial court erred by declining to transfer jurisdiction over this matter to Hungary on the basis that Pennsylvania is an inconvenient forum, assuming that the state possesses exclusive, continuing jurisdiction pursuant to Section 5422(a)(1). Father's Brief at 24-26. Father waived this claim by failing to include it in his concise statement. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]ssues not included in

an appellant's . . . concise statement of errors complained of on appeal are waived.").

Even if Father had not waived this claim, it would be meritless. This Court reviews inconvenient forum challenges under the UCCJEA pursuant to an abuse of discretion standard of review. *S.K.C.*, 94 A.3d at 414. Section 5427 of the UCCJEA provides as follows, in relevant part:

> **(a) General rule.--**A court of this Commonwealth which has jurisdiction under this chapter to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion or request of another court.
>
> **(b) Factors.--**Before determining whether it is an inconvenient forum, a court of this Commonwealth shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:
>
> > (1) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;
> >
> > (2) the length of time the child has resided outside this Commonwealth;
> >
> > (3) the distance between the court in this Commonwealth and the court in the state that would assume jurisdiction;
> >
> > (4) the relative financial circumstances of the parties;
> >
> > (5) any agreement of the parties as to which state should assume jurisdiction;

(6) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(7) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

(8) the familiarity of the court of each state with the facts and issues in the pending litigation.

23 Pa.C.S.A. § 5427(a)-(b).

The trial court rejected Father's request to transfer the case to Hungary. In its opinion, the court addressed each of the Section 5427(b) factors, as well as other relevant factors not listed in the statute. *See* 23 Pa.C.S.A. § 5427, Uniform Law Comment ("The list of factors that the court may consider . . . . is not meant to be exclusive."). The following is illustrative of its reasoning:

> . . . . Most notably, Mother has no connection whatsoever to Hungary and does not speak the language. If the matter were transferred to Hungary, Mother would have to hire a Hungarian attorney in order to be adequately represented and to overcome language barriers. Father has been connected to the Central Pennsylvania area for much of his life. The parties were married here and lived here during their marriage. Father routinely travels here since his move to Hungary. In addition, Father's mother lives in this area, Father maintains an interest in his Pennsylvania business and owns real estate and a car here. All these factors weigh in favor of this court exercising jurisdiction.
>
> Inasmuch as nearly all factors weigh in favor of finding Pennsylvania the more convenient forum, I denied Father's petition to transfer the matter to Hungary.

Trial Court Opinion, 9/26/18, at 28.

We again discern no abuse of discretion or error of law in the trial court's analysis. Plainly, the critical issues in this case relate to Father's attempts to

- 17 -

alienate Child from Mother, and to his claim that Mother suffers from mental health issues and is dangerous to Child. It appears that the majority of the relevant evidence relating to these issues is located in Pennsylvania, including the majority of witnesses and documents. Also significant is that Father lived in Pennsylvania and speaks the English language. He has family in the state and it would be relatively easy and inexpensive for him to return here and participate in the proceedings. In contrast, it would be oppressive to expect Mother to travel to Hungary or participate in proceedings there. Because the record supports the court's finding that this state is not an inconvenient forum pursuant to Section 5427, Father's claim does not entitle him to relief.

Father's final claim is that the trial court erred by denying his motion to continue the custody hearing following his alleged injury in Hungary. He contends that the court violated his right to due process by denying his motion despite a legitimate medical excuse and by prohibiting his counsel from presenting evidence or engaging in cross-examination. Father's Brief at 29-32. Father contends in particular that he did not have sufficient time to comply with the court's directive that an orthopedic surgeon in Pennsylvania review his medical records. *Id.* at 28-30.

Father fails completely to support his argument with citation to relevant legal authority. As such, Father has waived this claim. *See M.Z.T.M.W.*, 163 A.3d at 465 ("It is well-settled that this Court will not review a claim unless it

is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").

Even if Father had not waived this claim, we would conclude once again that it is meritless. We review a trial court's decision to deny a continuance pursuant to an abuse of discretion standard of review. *See In the Interest of D.F.*, 165 A.3d 960, 964-65 (Pa. Super. 2017), *appeal denied*, 170 A.3d 991 (Pa. 2017).

Here, Father contends that he suffered a "major double compound leg fracture" in early 2019. Father's Brief at 27. The exact date of Father's injury is not clear from the record but he appears to indicate in his brief that he suffered the injury by at least February 2019. *Id.* As detailed above, Father filed a motion to continue the custody hearing on March 26, 2019, attaching a copy of a "medical certificate" written in Hungarian, as well as a certified English translation. The trial court granted Father's motion and continued the hearing.

Father filed a second motion to continue on May 23, 2019, less than two weeks before the scheduled start of the hearing on June 4, 2019.[6] He averred that he remained unable to travel to Pennsylvania or participate in the hearing because of the same leg fracture that he suffered months earlier. While Father attached new documentation to his motion to continue, he did not include a

_____

[6] The trial court entered its order scheduling the hearing on April 22, 2019.

- 19 -

certified translation as he had before. Instead, he included an incomplete and partly incomprehensible translation that he appeared to have obtained using translation software. The trial court entered an order denying Father's motion on May 29, 2019, "unless a PA. reputable orthopedic surgeon, reviewing all medical record from [the] past [sixty] days, . . . opines [Father] cannot travel on commercial airlines[.]" Order, 5/29/19. Father failed to comply with the court's directive by the time of the June 4, 2019 hearing. Nonetheless, when Father's counsel appeared at the hearing, he again requested a continuance. The court denied the motion and precluded Father's counsel from participating in cross-examination, at the request of Mother's counsel.

The trial court explained its decision to deny Father's second motion for a continuance as follows:

> . . . [T]he medical document Father provided in support of his second continuance motion, dated May 2, 2019, included an uncertified, poor translation. The translated document suggested an issue of thrombosis with travel and that "long-term travel flight is not proposed." Contrary to Father's assertion in his statement of errors on appeal, the attached medical document *does not* state anywhere that Father is "unable to travel and participate in [a] custody hearing."
>
> To the extent the document can be interpreted as *recommending* Father not travel, it fails to indicate a time frame for this recommendation. Given that the alleged physician's excuse was issued more than a month prior to the scheduled custody hearing and failed to indicate when the physician had last examined Father, it failed to adequately support my continuing the hearing. Additionally, the physician did not opine that Father could not participate in a trial "in a competent and knowing manner" due to medication. Furthermore, the medical document dated March 12, 2019 that Father attached to his first continuance motion (filed March 26, 2019), made no suggestion whatsoever

that Father was unable to travel or lacked competency to participate in a custody trial. Father thus presented no credible evidence supporting his claims that he was "medically unable to travel and participate in the custody hearing."

Therefore, on May 29, 2019 I ordered that Father's motion seeking to be excused from appearing in person be denied unless he provided a medical opinion from a Pennsylvania orthopedic surgeon that opined Father was unable to travel by commercial plane. Because Father filed his continuance motion so late, Father had just five days to comply with this directive. My order did not foreclose Father from seeking to participate in the trial and testify via phone or videoconference, as he had done previously three times in this action. Since Father failed to provide a valid medical opinion in support of his claims, the hearing proceeded as scheduled, without Father's attendance.

At the hearing, Father's attorney orally renewed his request for a continuance, claiming that Father and his wife were attempting to collect his medical records in order to provide a second opinion as to his inability to travel but were running into bureaucratic hurdles. I denied Father's oral motion noting that I found dubious his claims he could not travel from an injury suffered five or six months earlier and that even if he were unable to travel, he had presented no credible evidence whatsoever of an inability to testify by telephone or videoconferencing.

Trial Court Opinion, 7/16/19, at 10-11 (emphasis in original).

In light of the record before the trial court, we discern no error of law or abuse of discretion in denying Father's motion to continue the parties' custody hearing. Given the length of time that elapsed between Father's first motion in March 2019 and his second motion in May 2019, it was incumbent on Father to produce updated documentation demonstrating that he remained incapable of traveling to Pennsylvania or participating in the hearing. Father failed to submit documentation until less than two weeks before the hearing. Further, the documentation that he submitted did not include an adequate translation.

To the extent Father's documentation was comprehensible, it did not indicate that he was unable to participate via telephone or videoconferencing software as he had done in the past.  Thus, the record supports the court's decision to deny Father's motion.

As a final matter, we find no merit to Father's argument that it was a violation of his right to due process to prevent him from presenting evidence or participating in cross-examination during the hearing.  While Father now complains on appeal that he did not have the opportunity to present evidence, Father's counsel stated at the time of the hearing that he had no evidence to present, due to his lack of communication with Father.  *See* N.T., 6/3/19, at 10 ("[Father's] position had remained the same as to what was elicited at the . . . hearing last year.  Other than that, Your Honor, I have no other exhibits or documentation that I would be able to elicit other than what was provided at the time of the hearing.").

Regarding Father's complaint that the trial court prevented his counsel from engaging in cross-examination, we conclude that this was a permissible sanction for Father's failure to file a pre-trial statement in compliance with the court's scheduling order.  Pa.R.C.P. 1915.4-4(b) provides that each party must file a pre-trial statement no later than five days prior to a pre-trial conference

in a custody proceeding.[7]  If a party fails to file a pre-trial statement, the trial court "may make an appropriate order under Pa.R.C.P. [] 4019(c)(2) and (4) governing sanctions."  Pa.R.C.P. 1915.4-4(c).  Here, the court sanctioned Father in accordance with Rule 4019(c)(2), which provides for the entry of an order "refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting such party from introducing in evidence designated documents, things or testimony, or from introducing evidence of physical or mental condition[.]"  Pa.R.C.P. 4019(c)(2).  The court's decision to apply Rule 4019(c)(2) was an appropriate exercise of its discretion and we see no basis to reverse or remand for further proceedings.

Based on the foregoing analysis, we conclude that the trial court did not commit an error of law or an abuse of discretion in concluding that it possessed subject matter jurisdiction over this matter and in denying Father's motion for a continuance.  Therefore, we affirm the court's June 4, 2019 order.

Order affirmed.

---

[7] The trial court explains that it did not schedule a pre-trial conference in this matter because it appeared unlikely that the parties would settle and because of the need to move the matter forward given Mother's lack of recent contact with Child.  Trial Court Opinion, 7/16/19, at 5 n.3.  Nonetheless, the court included a provision in its April 22, 2019 scheduling order directing that the parties file a pre-trial statement.  Father had notice of this provision for over a month prior to the hearing on June 3, 2019, and failed to comply.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 04/14/2020